UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| THOMAS YUEN and SUMNI AHN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No.<br><br>COMPLAINT - CLASS ACTION |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| TRANSOCEAN LTD. and STEVEN L. NEWMAN, | ) ) ) | |
| Defendants. | ) ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## INTRODUCTION AND OVERVIEW

1.       This is a securities fraud class action on behalf of all persons who purchased or otherwise acquired the common stock of Transocean Ltd. ("Transocean" or the "Company") between August 5, 2009 and May 7, 2010, inclusive (the "Class Period").  This action is brought against Transocean and one of its senior officers and/or directors for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5 promulgated thereunder in connection with the dissemination of false and misleading statements about the Company's deficient safety protocols, recurring blowout preventer ("BOP") problems, and its operating and safety record.

2.       Transocean is an owner and/or operator of approximately 140 mobile offshore drilling units.  During the Class Period, defendants falsely represented that Transocean had remedied its past safety problems and was closely monitoring the Company's operating and equipment, while omitting to disclose material information concerning Transocean's repeated safety failures and recurring BOP issues.  Defendants falsely represented that the Company's BOP problems "have all been resolved," and that BOP issues were "anomalies," concealing that the Company had not eliminated BOP issues nor rectified the prior BOP failures.  As a result of defendants' false and misleading statements, Transocean's common stock traded at artificially inflated prices during the Class Period, reaching a high of $94.88 per share on January 11, 2010.

3.       In the last ten years, defendants have – on several occasions – been apprised of the serious hazards associated with Transocean's use of certain BOPs on ultra-deepwater drilling engagements.  Despite these warnings and defendants' knowledge that a BOP failure would likely result in scores of fatalities and millions of gallons of oil being released into the surrounding waters, defendants opted to conceal their knowledge of these known hazards while making false and misleading statements throughout 2009 and into 2010.

4.     On April 20, 2010, an explosion on Transocean's semi-submersible drilling rig Deepwater Horizon ("Horizon") caused a fire which resulted in the sinking of the Horizon, which had been drilling approximately 41 miles offshore from Louisiana on Mississippi Canyon block 252. As a result of the fire and the explosion, eleven crew members lost their lives, and seventeen others were injured.  Additionally, the subsequent failure of Horizon's safety mechanisms, including the BOP, led to a massive oil spill which covers an estimated surface area of at least 2,500 square miles. This oil spill is currently discharging an estimated 200,000 to 1.1 million gallons of crude oil **_daily_**. The spill is expected to eclipse the 1989 Exxon Valdez oil spill as the worst U.S. oil disaster in history, and experts fear it will result in an environmental disaster as oil from the well site damages the fishing and tourism industries in the Gulf of Mexico and the habitat of hundreds of fish, sea mammal and bird species.

5.     As the truth about the full extent of the disaster was absorbed by the market over the two weeks following the explosion and oil spill, Transocean shares fell $25.69 per share, closing at $66.34 per share on May 10, 2010.

6.     As a result of defendants' false and misleading statements, Transocean's common stock traded at inflated levels during the Class Period.  After the above revelations, when it became apparent that Transocean had made false and misleading statements and omissions, and had failed to take necessary precautions to avoid such a catastrophic spill, the Company's common stock declined.  The price of the Company's common stock declined nearly 28% from its Class Period high.  This drop removed the inflation from Transocean's share price, causing real economic loss to investors who had purchased Transocean common stock during the Class Period.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant §§10(b) and 20(a) of the 1934

Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R.

§240.10b-5].

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

§1331 and §27 of the 1934 Act.

9.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C.

§1391(b).  Transocean has operations in Louisiana.  Many of the acts charged herein, including the

dissemination of materially false and misleading information, occurred in substantial part in this

District and/or had a significant effect on this District.

10.    In connection with the acts alleged in this complaint, defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,

the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

11.    Plaintiffs Thomas Yuen and Sumni Ahn acquired Transocean common stock as set

forth in the attached certification and have been damaged thereby.

12.    Defendant Transocean is an international provider of offshore contract drilling

services for oil and gas wells around the globe.  Transocean is a Louisiana company founded in 1919

as Danciger Oil & Refining Company.  After many name changes, business combinations, and other

modifications (for business reasons and tax avoidance purposes), Transocean is currently a Swiss

company which purports to be located in Vernier, Switzerland.  Transocean's shares trade in an

efficient market on the NYSE.

13.    Defendant Steven L. Newman ("Newman") is the President and Chief Executive

Officer ("CEO") of Transocean.  Newman received total compensation of $5.3 million in 2009 based

on Transocean's purported success. Before his role as President and CEO in 2010, Newman served as President and Chief Operating Officer from mid-2008 to late 2009.

14.     Defendants made, or caused to be made, false and misleading statements, or omitted to disclose necessary information concerning (i) the Company's deficient safety efforts; (ii) the heightened hazards associated with the BOPs used by the Company; (iii) the likelihood that the equipment required to drill at depths such as those encountered by the Horizon rig would likely render Transocean's safety protocols, including the BOPs, ineffective; and (iv) the Company's significant exposure to liability as a result of these unmitigated hazards, which caused the price of Transocean common stock to be artificially inflated during the Class Period.

## CLASS ACTION ALLEGATIONS

15.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired the common stock of Transocean during the Class Period (the "Class"). Excluded from the Class are defendant Newman and his family members, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

16.     The members of the Class are so numerous that joinder of all members is impracticable. Transocean's common stock is actively traded on the NYSE. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Transocean and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

17.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

18.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

19.     Common questions of law and fact predominate and include whether defendants: (i) violated the 1934 Act; (ii) omitted and/or misrepresented material facts; (iii) knew or recklessly disregarded that their statements were false; and (iv) artificially inflated the price of Transocean common stock and the extent of and appropriate measure of damages.

20.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## BACKGROUND

21.     Transocean was founded in Louisiana in 1919 as Danciger Oil & Refining Company. After many name changes, business combinations, and other modifications (for business reasons and tax avoidance purposes), Transocean is currently a Swiss company.  Today, Transocean purports to be the world's largest offshore drilling contractor with operations around the globe.

22.     There are many different types of platforms for offshore drilling activities, from shallow-water steel jackets and jackup barges, to floating semi-submersibles and drillships able to operate in very deep waters.  Recently, Transocean has shifted its focus toward deepwater and ultra-deepwater drilling.  Today, Transocean's fleet of drilling units consisted of 44 High-Specification

Floaters (Ultra-Deepwater, Deepwater and Harsh Environment semi-submersibles and drillships), of which 13 are located in the Gulf of Mexico.

23.     The Company also provides oil and gas drilling management services, drilling engineering and drilling project management services, and participates in oil and gas exploration and production activities.   Drilling management services are provided through Applied Drilling Technology Inc., the Company's wholly owned subsidiary, and through ADT International, a division of one of its U.K. subsidiaries (together, "ADTI").   ADTI conducts drilling management services primarily on either a dayrate or a completed-project, fixed-price, or "turnkey," basis. Transocean's oil and gas properties consist of exploration, development and production activities. As part of its mission statement, Transocean purports to adhere to a "safety vision," to wit: "Our operations will be conducted in an incident-free workplace, all the time, everywhere."

**Blowout Preventers and Transocean's Maintenance and Safety Problems**

24.     Each drilling rig is supposed to be equipped with safety mechanisms including a blowout preventer, which serves as the failsafe.  A blowout preventer, or "BOP," is a five-story-tall, 900,000-pound concrete contraption that has always served as a critical "fail safe" backstop for an offshore oil rig's valve at the top of a well that may be closed if the drilling crew loses control of formation fluids.  By closing this valve the drilling crew usually regains control of the reservoir, and procedures can then be initiated to increase the mud density until it is possible to open the BOP and retain pressure control of the formation.  BOPs come in a variety of styles, sizes and pressure ratings. Some can effectively close over an open wellbore, some are designed to seal around tubular components in the well (drillpipe, casing or tubing) and others are fitted with hardened steel shearing surfaces that can actually cut through drillpipe.  Because BOPs are critically important to the safety of the crew, the rig, and the wellbore itself, BOPs are supposed to be inspected, tested and refurbished at regular intervals determined by a combination of risk assessment, local practice, well

type, and legal requirements. BOP tests vary from daily function testing on critical wells to monthly or less frequent testing on wells thought to have low probability of well control problems.



25.    Since prior to the commencement of the Class Period, Transocean has been aware of the problems associated with the BOPs used on its rigs, and the ineffectiveness of the BOPs. For example, in June 2000, BP issued a "notice of default" to Transocean over problems with a BOP on the Company's Discover Enterprise rig. At the time, Transocean acknowledged that its BOP did "not work exactly right," and Discover Enterprise was unable to operate for extended periods while the problem was purportedly resolved. The Discover Enterprise BOP was made by Hydril, now owned by GE's oil and gas arm, and Cameron International, a Houston company. Cameron also made the BOP on Transocean's Horizon rig, whose BOP was fitted in 2000 – approximately the same time BP issued this "notice of default."

26.    In a 2003 report titled "Deepwater BOP Control Systems – A Look at Reliability Issues," co-authored by the then-director of technology development for Transocean, Earl Shanks, and presented at the 2003 Offshore Technology Conference in Houston, Texas, a warning was issued

that the industry was not taking the time necessary to find and fix the problems that commonly plagued BOPs.  According to the 2003 Report, the offshore exploration and production industry was so focused on drilling that it was willing to pay higher maintenance costs to keeps rigs operating and avoid downtime rather than address some of the fundamental problems with the blowout preventers.  "Floating drilling rig downtime due to poor BOP reliability is a common and very costly issue confronting all offshore drilling contractors," the 2003 Report noted, adding that every major disruption could cost $1 million.  The 2003 Report said the reliability issues were directly related to the fact that drilling companies did not have detailed design and functional specifications to give BOP manufacturing companies.  The BOPs were being rushed into the field with limited testing, and if one malfunctioned, the pressure to keep drilling meant it was fixed with little time spent trying to figure out what had caused the malfunction.  According to the 2003 Report:

> Because of the pressure on getting the equipment back to work, root cause analysis of the failures is generally not performed.  In many operations, high maintenance is accepted as a necessary evil to prevent downtime.
>
> High maintenance can be a tool to reduce failures in operation.  However, this is a very expensive approach, and it is also an opportunity to introduce human error into the system.  Also, this method does not establish reliability based on a failure rate.
>
> In general, operating reliability is maintained on rigs mostly through regular maintenance intervals rather than specifying a reliability of a system or component to minimize maintenance.

27.     On August 24, 2005, Great Britain's Health and Safety Executive ("HSE") issued a notice to Transocean for failing to ensure that a rig's BOP was properly maintained:

> Failed to ensure that all plant provided in compliance of these Regulations, namely your Driller's Remote Blow Out Preventor control panel, was maintained in an efficient state, efficient working order and in good repair.

28.     Similarly, in June 2006, the HSE cited Transocean for problems and deficiencies related to Transocean's BOP testing:

The multi-purpose tool used in blow-out preventer pressure testing was not so constructed as to be suitable for the purpose for which it was provided: and failed in service, exposing persons to risks that endangered their safety on 29th April 2006

29.     In June 2008, a paper co-authored by Jeff S. Shepard, manager of Transocean's "Subject Matter Team," and titled "Ultradeep Drilling Pushes Drillstring Technology Innovations," was published in the Society of Petroleum Engineers *Drilling & Completion*.  The paper cautioned that "BOP shear rams may also have difficulty shearing today's high-strength, high-toughness drillpipe," explaining, in part:

**BOP Pipe Shearing**.  The use of higher-strength, higher-toughness drillpipe of increased wall thickness required to absorb high tensile loading has in some cases exceeded the capacity of some BOP shear rams to successfully and/or reliably shear drillpipe.  Several variables impact a BOP's ability to shear drillpipe, including:

- Drillpipe outside diameter

- Drillpipe wall thickness

- Drillpipe material strength (ultimate and yield)

- Drillpipe material toughness/ductility

- Wellbore pressure (mud-hydrostatic head and trapped well-bore pressure equal to maximum BOP working pressure)

To reduce the probability of drillstring failure, ***the industry has increased its appetite for high-toughness drillpipe***.  Increased material toughness/ductility provides resistance to crack propagation and often enables the material to sustain a through-wall crack without catastrophic failure, commonly known as "leak before break." . . .

***Over the past few years, it has become clear that this successful improvement to drillpipe properties has not been achieved without consequence. Several publications have presented the effects of improved-drillpipe properties on BOP shearing capabilities***.  This has initiated multiple industry studies, including those performed by regulatory bodies.  A consistent finding throughout all of these studies is that ***drillpipe material ductility and toughness is one of the major influences to the amount of force/pressure required for shear rams to successfully and reliably shear drillpipe***.

\*     \*     \*

**Conclusions**

*      *      *

5.  UDD presents increased operational considerations that require attention of the well designer.  BOP shearing capacity of drill-pipe and BOP pressure integrity upon drillpipe collapse are adversely affected in UD wells.  Well designers should work closely with OEMs to fully evaluate the performance limits of these products in ultradeep applications.

**Transocean's Deepwater Horizon Rig and the Gulf Drilling Operations**

30.     Deepwater Horizon, one of Transocean's Ultra-Deepwater Floaters, is a specialized ultra-deepwater, dynamically positioned, column-stabilized, semi-submersible offshore drilling unit with a high-pressure mud pump and a water depth capability of 7,500 feet or greater.  Horizon was built by Hyundai Heavy Industries in Ulsan, South Korea. Construction started in December 1998 and it was delivered in February 2001.  Horizon was the second rig constructed of a class of two, although the Deepwater Nautilus, its predecessor, is not "dynamically positioned."  Since arriving in the Gulf of Mexico, Horizon has been under contract to BP Exploration.[1]

31.     In 2002, the rig was upgraded with "e-drill," a drill monitoring system where technicians based in Houston, Texas receive real-time drilling data from the rig and transmit maintenance and troubleshooting information.

32.     While the Horizon did have a BOP, it did not, however, have a remote-control shut-off switch on the BOP known as an "acoustic switch."  Acoustic switches, used by Transocean on several of its rigs in locations such as Norway and Brazil, allow a crew to shut down a damaged well by triggering an underwater valve.  The switch is used if other attempts fail, since the primary shut-

---

[1]     On October 17, 2009, BP and Transocean agreed to extend the Horizon lease.  The three-year extension was set to begin in September 2010 and would pay $544 million, or $496,800 a day, over the three-year period.  By contrast, the current day rate is about $487,500.

off systems usually work on wells when they are out of control.  It can be activated from a lifeboat if an oil platform must be evacuated.

33.     On September 3, 2009, BP announced what it characterized as a "giant" new oil discovery more than six miles deep in the Gulf of Mexico, but said it may take years to assess how much crude could actually be recovered.  Because of the depth of the find and the fact that the oil and gas in the field was extremely hot and under intense pressure, BP officials noted that the extraction would require advanced wellheads with thick steel and exceptional insulation.  Transocean's Horizon rig was contracted to drill this well.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

34.     Throughout the Class Period, defendants failed to disclose the serious risks Transocean faced as a result of its ongoing utilization of deficient BOPs.  Defendants also omitted to disclose that on numerous prior occasions, Transocean had been censured or otherwise disciplined for BOP failures and problems, and that these problems were systemic, affecting all rigs which relied on BOPs as a last line of defense against catastrophic disasters.

35.     On August 5, 2009, on the Company's Q2 2009 earnings conference call, defendant Newman made the following statements:

*Arun Jayaram – Credit Suisse – Analyst*

Yes, good morning.  Bob, I was wondering if you could comment a little bit, at least in this quarter, about the deepwater revenue efficiency.  The utilization, I guess, for all three segments was below my expectations.  I was wondering if you can comment if there is any quarter-specific items that led to the lower unexpected utilization.

\*      \*      \*

[Newman:]  We had a couple of human error incidents on drill floors on a couple of those rigs and we had a handful of BOP problems.  Nothing that I would characterize as systemic or quarter-specific.  We did a deep dive on each one of those incidents.  We have identified the root causes.  ***We are going back to address them in our***

*management system so they don't happen again*.  It is uncharacteristic in the second quarter.  They were *anomalies* and I think I would just leave it at that.

*Arun Jayaram – Credit Suisse – Analyst*

Steven, any of those issues, could they impact Q3, these BOP issues that you're citing?

[Newman:]  No, no, no.  *They have all been resolved* and BOP operations are a complex part of our business.  It is something we pay a lot of attention to.  *All of the BOP incidents that occurred in the second quarter have been resolved and we will continue to keep our eye closely on the performance of our subsea equipment.*

\*     \*     \*

[Newman:]  [T]here are some older rigs in that fleet, but it is not really a reflection of the age of the fleet.  *The BOP problems we had were on [a] combination of modern generation and older systems.  The human error – the couple of human error issues we had were really completely unrelated to the age of the rigs whose guys were working on.*  So it doesn't have a lot to do with the age of the fleet.

36.     On February 24, 2010, defendants held a conference call to discuss the Company's Q4 2009 earnings results and operations.  During the call, defendant Newman made the following statements:

*Tom Curran – Wells Fargo Securities – Analyst*

. . . In terms of where utilization came in below what you would have expected based on scheduled downtime, were there any issues remotely similar to those that occurred in the second quarter of 2009, where we had both technical problems related to BOPs as well as what was categorized as some human error problem?

[Newman:]  On the Ultra-Deepwater fleet, Tom, where we were particularly focused in the fourth quarter – and that differs from where we were in the second quarter of last year, which was on the conventional Deepwater fleet.  In the Ultra-Deepwater fleet, *we only had one BOP issue and one human error issue*.

We had a couple of startup issues and we had some equipment failures.  But the issues in the fourth quarter were largely dissimilar from what we saw in the second quarter of last year.

*Tom Curran – Wells Fargo Securities – Analyst*

So would it be fair to say then that both the nature and the number of those issues in Q4 was more in line with what you would consider normal, whereas second-quarter 2009 was clearly abnormal?

[Newman:]   Yes, I wouldn't characterize the fourth quarter of 2009 – I wouldn't characterize the performance on the Ultra-Deepwater fleet as normal, because it was below the historical revenue efficiency for that class.  So I don't want to lead you to conclude that that is something we ought to expect going forward.

But we have identified the issue, the equipment failure issues.  ***We have addressed the BOP control issue***.  And the human error issue is something we continue to focus on through our training and competency programs.

37.    On or about March 1, 2010, Transocean issued its annual Proxy Statement to shareholders in which it claimed that although its executives qualified for bonuses under the safety metrics in place, the executives were receiving no bonuses since the Company had "incurred four fatalities with varying causes in varying regions around the world."  The Proxy asserted that:

The Committee took this extraordinary action to underscore the Company's commitment to safety and to increase the incentive for executive officers to promote the goal of an incident-free workplace and, in particular, the avoidance of future fatal accidents.

38.    Transocean's executives were well compensated notwithstanding this decision to withhold bonuses, including Newman, who received total compensation of $5.3 million for 2009.

39.    On the evening of April 20, 2010, at around 10 p.m., the semi-submersible Horizon experienced an explosion and catastrophic fire.  The explosion and fire killed 11 people and injured 17 others.  Two days later, on April 22, 2010, Horizon sank into the depths of the Gulf of Mexico and a five-mile long oil slick was seen shortly thereafter.

40.    On April 28, 2010, the U.S. Coast Guard disclosed that it believed that the oil pouring out of the broken well was doing so at a rate five times greater than originally estimated, and that the spill could be bigger than the 1989 Exxon Valdez spill in Alaska's Prince William Sound.

41.    On April 29, 2010, *The Wall Street Journal* revealed in a report entitled "Oil Well Lacked Safeguard Device – Officials Say Leak Grows Fivefold" that the Horizon lacked an acoustic

switch.  The acoustic switch, a last resort safety mechanism found on Transocean drilling rigs in Brazil and Norway, can be used by a drilling crew to "trigger an underwater valve that shuts down the well even if the oil rig itself is damaged or evacuated."

42.     In response to this news, the price of Transocean shares plunged $6.32 to close at $78.51 on April 29, 2010.

43.     The next day, on April 30, 2010, on the news that U.S. Attorney General Eric Holder was dispatching a team of lawyers to New Orleans to monitor the oil spill and that the Obama administration would vigorously enforce environmental laws, the price of Transocean dropped another $6.19 to close at $72.32.  "The Justice Department stands ready to make available every resource at our disposal to vigorously enforce the laws that protect the people who work and reside near the Gulf, the wildlife, the environment and the American taxpayers," Holder said in a statement.

44.     On May 5, 2010, Transocean filed its Form 10-Q for the quarter ended March 31, 2010.  In its Form 10-Q, the Company explained that the Departments of Homeland Security and Interior had begun a joint investigation into the Company and the cause of the incident.  In addition, various committees and subcommittees of the United States House of Representatives and Senate have requested Transocean's participation in hearings related to the disaster, and the Company also received a request from the United States Department of Justice to preserve information related to the April 20, 2010 fire, explosion and sinking of the Horizon, as well as the oil spill.

45.     In response to this, shares of Transocean's common stock fell $3.06 per share to close at $69.70 per share on May 6, 2010, on high volume.

46.     On May 10, 2010, the extent of defendants' deception began to surface in a news report published by *The Wall Street Journal* entitled "Rig Owner Had Rising Tally of Accidents." The article explained Transocean's recent problematic safety history and noted that "[n]early ***three***

*of every four incidents that triggered federal investigations into safety and other problems on deepwater drilling rigs in the Gulf of Mexico since 2008 have been on rigs operated by Transocean*."  Between 2005 and 2007, a "Transocean rig was involved in 13 of the 39 deep-water drilling incidents investigated by the MMS in the Gulf of Mexico, or 33%.  That's roughly in line with the percentage of deep-water rigs, 30%, Transocean owned and operated in the Gulf then, according to data firm RigLogix."  However, "[s]ince the merger, *Transocean has accounted for 24 of the 33 incidents investigated by the MMS, or 73%, despite during that time owning fewer than half the Gulf of Mexico rigs operating in more than 3,000 feet of water*."

47.    As a result of this revelation, the price of Transocean common stock fell an additional $1.67 on May 10, 2010, a day in which the S&P 500 increased 4.3%.  In all, as a result of these events and the disclosure of the previously concealed fact that Transocean had been the subject of numerous safety citations and increasing operational and safety investigations, the price of Transocean common stock fell $25.69 per share from April 20, 2010 through May 10, 2010, a decline of almost 28%.

48.    The statements made by defendants during the Class Period were each false and misleading when made as defendants failed to disclose the true facts, including:

(a)    Transocean had recurring and undisclosed safety issues throughout the Class Period.  In fact, as it was disclosed at the end of the Class Period, of the four fires aboard deep-water drilling rigs investigated by the U.S. Minerals Management Service ("MMS") since 2005, all were operated by Transocean, including a fire that broke out on a brand-new Transocean rig, the Discoverer Clear Leader, which knocked out power to the thrusters that keep the rig in position above the well – a serious situation, because if a rig drifts too far it can disconnect from the well and

cause a spill.  Additionally, in November 2005, Transocean's Horizon rig spilled over 200 barrels of an oil-based lubricant into the Gulf of Mexico due to equipment failure and human error.

(b)      Defendants had not resolved the BOP problems and the BOP accidents and occurrences were not "anomalies."  In fact, during the preceding ten years, Transocean had been cited numerous times by both customers and governmental agencies for BOP failures and lax oversight.  For example, as revealed at the end of the Class Period, in 2006, when Transocean's Discoverer Enterprise was drilling for BP in over 6,000 feet of water and suffered a leak from the blowout preventer causing 54 barrels of drilling fluid to spill into the Gulf, the MMS said the problem was caused in part by "extended use of [the BOP] without inspection/maintenance."

(c)      Defendants knew that BOPs operating on ultra-deep drilling rigs were inherently unsafe and Defendants failed to disclose that these "fail safe" mechanisms could not perform the critical "fail safe" function they were intended for.  In fact, defendants were aware, by virtue of the several industry papers on BOP failures, that the equipment necessary to successfully drill at depths similar to those encountered with the Horizon, would interfere with the effective operation of Transocean's safety protocols, including the BOP.

(d)      Throughout the Class Period Transocean did not have the necessary and proper safety protocols in place such that it was just a matter of time before an incident of catastrophic proportions occurred.  Indeed, Transocean knew that drilling at significant depths – such as those encountered by the Horizon – required specialized equipment that would render Transocean's safety protocols, including the BOP, ineffective.

49.      As a result of defendants' false and misleading statements and omissions, Transocean common stock traded at inflated levels during the Class Period.  After the above revelations, when it became apparent that Transocean's safety mechanisms and protocols – including the critical BOP –

had failed and that Transocean had not only contributed to dozens of fatalities and injuries, and been at the root of a multi-million gallon oil spill, but had also been the subject of numerous and recurring citations and investigations for poor operational and safety performance, the Company's common stock declined.  The price of the Company's common stock declined nearly 28% from its Class Period high.  This drop removed the inflation from Transocean's share price, causing real economic loss to investors who had purchased Transocean common stock during the Class Period.

**The Aftermath of Transocean's Disaster**

50.     Following the catastrophic fire, explosion and oil spill, Louisiana, Alabama, Mississippi and Florida have all declared states of emergency as winds pushed the oil slick toward sensitive marshlands and fishing areas.

51.     While the oil industry has always touted the BOP as a key to its ability to drill offshore without great risk to the environment, Senator Maria Cantwell of Washington, the chairwoman of two key Senate Commerce and Energy Committee subcommittees with oversight over offshore oil drilling, said following the devastating incident that the oil industry's portrayal of this kind of failure as unprecedented does not stand up to examination.  "There is clear evidence that the oil industry has been well aware for years of the risk that blowout preventers on offshore rigs could fail," said Cantwell, who has stated that her staff found extensive documentary evidence demonstrating the problems with BOPs.  "Despite frequent failures, [the] industry assumed the preventers were fail-safe and, as a result, had no back-up plan for responding to a catastrophe like the one now unfolding in the Gulf."

**LOSS CAUSATION/ECONOMIC LOSS**

52.     During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Transocean common stock and operated as a fraud or deceit on Class Period

purchasers of Transocean common stock by misrepresenting the Company's business and prospects. Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Transocean common stock fell precipitously, as the prior artificial inflation came out of the prices over time. As a result of their purchases of Transocean common stock during the Class Period, plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

53. Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's common stock traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e) Plaintiffs and other members of the Class purchased Transocean common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

54. At all relevant times, the market for Transocean common stock was efficient for the following reasons, among others:

(a) As a regulated issuer, Transocean filed periodic public reports with the SEC; and

- 18 -

(b)     Transocean regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

55.     Plaintiffs incorporate all allegations in ¶¶1-54 above by reference.

56.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

57.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Transocean common stock during the Class Period.

58.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Transocean common stock.  Plaintiffs and the Class would not have purchased Transocean common stock at the prices they paid, or at all, if they

had been aware that the market prices had been artificially and falsely inflated by the defendants' misleading statements.

59.     As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of Transocean common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

60.     Plaintiffs incorporate all allegations in ¶¶1-59 above by reference.

61.     Defendant Newman acted as a controlling person of Transocean within the meaning of §20(a) of the 1934 Act.  By virtue of his position and power to control public statements about Transocean, defendant Newman had the power and ability to control the actions of Transocean and its employees.  Transocean controlled defendant Newman and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding damages and interest;

C.     Awarding plaintiffs' reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED:  May 13, 2010                 BOOTH & BOOTH, APLC


/s/ Vincent J. Booth
_____
VINCENT J. BOOTH (#18565)
138 North Cortez Street
New Orleans, Louisiana 70119
Telephone:  504-482-5292
Facsimile:   800-469-2185
Email:  vbooth@boothandbooth.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
DARREN J. ROBBINS
DAVID C. WALTON
BRIAN O. O'MARA
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

LAW OFFICES BERNARD M.
   GROSS, P.C.
DEBORAH R. GROSS
Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA  19107
Telephone:  215/561-3600
215/561-3000 (fax)

JAROSLAWICZ & JAROS
DAVID R. JAROSLAWICZ
225 Broadway, 24th Floor
New York, NY  10007
Telephone:  212/227-2780
212/227-5030 (fax)

Attorneys for Plaintiffs

S:\CptDraft\Securities\Cpt Transocean.doc