UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| THOMAS YUEN and SUMNI AHN, Individually and on behalf of all others similarly situated, | * * * * | CIVIL ACTION NO. 10-1467 SECTION "R" |
| Plaintiffs, | * * | JUDGE SARAH S. VANCE |
| verses | * * | MAG. (1) |
| TRANSOCEAN, LTD and STEVEN L. NEWMAN, | * * * | MAGISTRATE SALLY SHUSHAN JURY DEMAND |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF THE MOTION OF DANICA PENSION A/S FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF LEAD PLAINTIFF'S SELECTION OF LEAD COUNSEL AND LIAISON COUNSEL**

Class member Danica Pension A/S ("Danica") respectfully submits this memorandum in support of its Motion for: (i) appointment as lead plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B); (ii) approval of its selection of Barroway Topaz Kessler Meltzer & Check, LLP ("Barroway Topaz") as lead counsel; and (iii) approval of its selection of Lowe, Stein, Hoffman, Allweiss & Hauver, L.L.P. ("Lowe Stein") as liaison counsel.

## I. PRELIMINARY STATEMENT

Presently pending in this district is a securities class action lawsuit brought on behalf of all purchasers of Transocean Ltd. ("Transocean" or the "Company") common stock between August 5, 2009 and May 7, 2010 against Transocean and certain of its officers and directors for violations of the Securities Exchange Act of 1934.[1]

---

[1] Two related securities class action lawsuits captioned *Johnson Investment Counsel, Inc. v. Transocean Ltd., et al.,* No. 10-cv-4515 and *Foley v. Transocean Ltd., et al.,* 10-cv-5233, are

Having suffered losses totaling approximately $4 million on a first-in, first-out ("FIFO") basis, and $3.7 million on a last-in, first-out ("LIFO") basis as a result of its transactions in Transocean common stock during the Class Period, Danica believes it has suffered the largest financial loss of any movant seeking appointment as lead plaintiff in this matter. As the movant with the largest financial interest that otherwise meets the applicable requirements of Rule 23 of the Federal Rules of Civil Procedure ("Rule 23"), Danica believes it is entitled to appointment as lead plaintiff.[2] Further, Danica respectfully requests the Court approve its selection of lead and liaison counsel on behalf of the class. *See* § III.C, *infra*; *Tarica v. McDermott Int'l, Inc.*, No. 99-3831, 2000 U.S. Dist. LEXIS 5031, at *16 (E.D. La. Apr. 13, 2000) (Vance, J.) ("the most adequate plaintiff[s] shall, subject to the approval of the court, select and retain counsel to represent the class") (quoting 15 U.S.C. § 78u-4(a)(3)(B)(v)).

## II. FACTUAL BACKGROUND

Transocean is the world's largest provider of offshore contract drilling and management services for oil and gas wells. The Company's primary operations include both developmental and experimental drilling activities. Transocean's primary business is to contract its drilling rigs, related equipment and work crews to drill oil and gas wells for oil companies, such as BP plc ("BP"). In addition to its offshore drilling operations, the Company also provides oil and gas drilling

---

currently pending in the Southern District of New York. These actions assert a class period between August 5, 2009 and June 1, 2010 (the "Class Period"). For purposes of this motion, Danica's financial interest is calculated based on the class period pled in the *Johnson Investment Counsel* and *Foley* actions.

[2] Danica has submitted a sworn certification signed by Jesper Hjetting, its Senior Vice President, demonstrating its desire to serve as lead plaintiff in this action and its understanding of the attendant duties and obligations of serving as such. *See* Affidavit of Mitchell J. Hoffman in Support of the Motion of Danica Pension A/S for Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Lead Counsel and Liaison Counsel ("Hoffman Aff.") at Ex. A.

management services, as well as drilling engineering and drilling project management services. As of February 2, 2010, the Company owned or operated 138 offshore drilling units, including 23 ultra-deepwater and 16 deepwater rigs. Transocean's fleet of ultra-deep water rigs included the Deepwater Horizon semi-submersible rig.

During the last several years, the Company and its officers have know about, but did not publicly disclose a number of serious incidents on the Deepwater Horizon, which was issued citations for being "an acknowledged pollution source" by the U.S. Coast Guard some 18 times in the last 11 years.[3] The defendant also misrepresented Transocean's ability to identify and correct defects on blow out preventers ("BOP"),[4] a critical device necessary for its business and often the last line of defense to prevent against an oil spill should a problem arise in the Company's oil drilling operations.

For example, on August 5, 2009, during the Company's second quarter 2009 earnings conference call, defendant Steven Newman, Transocean CEO, dismissed the fact that the Company experienced BOP issues in the quarter. According to Newman: "we had a handful of BOP problems. ***Nothing that I would characterize as systemic*** or quarter-specific. We did a deep dive on each one of those incidents. ***We've identified the root causes .... [t]hey were anomalies. . . .***"[5] When asked if these issues would continue to plague the Company in third fiscal quarter of 2009, Newman responded, ***"No, no, no. They have all been resolved . . ."*** As a result of defendants' false and

---

[3] Unless otherwise noted, facts are taken from the complaint filed in *Johnson Investment Counsel*.

[4] Because BOPs are critically important to the safety of the crew, the rig, and the wellbore itself, BOPs are supposed to be inspected, tested and refurbished at regular intervals determined by a combination of risk assessment, local practice, well type, and legal requirements.

[5] All emphases are added unless otherwise noted.

3

misleading statements, Transocean's common stock traded at artificially inflated prices during the Class Period, reaching a high of $94.88 per share on January 11, 2010.

On April 20, 2010, the truth about Transocean's false and misleading statements began to surface. At approximately 10:00 pm on April 20, 2010, at the Macondo prospect site about 50 miles off of the Louisiana coast in the Gulf of Mexico (the "Gulf"), an eruption of oil and natural gas set fire to Transocean's Deepwater Horizon rig. At the time of the disaster, the Deepwater Horizon was drilling an exploratory oil well for BP. The fire eventually consumed the Deepwater Horizon causing it to sink several hours after the initial explosions. As the rig sank, it pulled a 5,000 foot pipe (the "riser") with it. The riser subsequently tore away from the well, and oil began leaking into the Gulf. The Deepwater Horizon crewmembers' efforts to trigger the BOP failed leading to millions of barrels of oil spilling into the Gulf. Oil continues to leak into the Gulf, and the Gulf oil spill has become the worst oil related environmental disaster in the history of the United States.

Reports about numerous problems in Transocean's BOPs and shortcuts taken by the Company at the Macondo prospect site prior to the spill began filtering into the market days after the Deepwater Horizon disaster. For example, on April 28, 2010, *The Wall Street Journal* revealed in an article entitled "Leaking Oil Well Lacked Safeguard Device" that the BOP under the Deepwater Horizon lacked an acoustic switch. An acoustic switch allows crews to activate a BOP remotely in case a rig must be evacuated. Also, witnesses aboard the Deepwater Horizon reported that managers were notified prior to the disaster about the BOP being defective.[6] These complaints were dismissed. On May 10, 2010, *The Wall Street Journal* published an article entitled "Rig Owner Had Rising Tally of Accidents." The article explained Transocean's recent problematic safety history

---

[6] "Blowout: The Deepwater Horizon Disaster," *60 Minutes* (May 16, 2010).

4

and noted that "[n]early three of every four incidents that triggered federal investigations into safety and other problems on deepwater drilling rigs in the Gulf of Mexico since 2008 have been on rigs operated by Transocean." In response, the Company's stock fell from a closing price of $68.01 per share (as of May 7, 2010) to close at $66.34 (as of May 10, 2010).[7] Additional corrective disclosures continued filtering into the market. According to *The New York Times*, "[t]he likelihood of civil enforcement proceedings for violations of various environmental laws is almost guaranteed for . . . Transocean."[8]

Revelations following the Deepwater Horizon disaster have resulted in massive investor losses as corrective disclosure removed artificial inflation from the Company's stock price caused by defendants' false and misleading statements. On April 20, 2010, just prior to the Deepwater Horizon disaster, Transocean's common stock closed at $92.03 per share. By April 23, 2010, Transocean's stock closed at $89.89 per share. By June 1, 2010, Transocean common shares closed at $50.04 per share, a decline of 45% from its closing price on April 20. The declines in Transocean's stock price after April 20, 2010, are directly related to the market absorbing information correcting defendants' misstatements and material omissions.

### III. ARGUMENT

#### A. The PSLRA's Lead Plaintiff Provisions

The PSLRA establishes the procedures for selecting a lead plaintiff in class action lawsuits alleging violations under the federal securities laws. *See* 15 U.S.C. § 78u-4(a).

---

[7] The May 10, 2010 disclosure marked the end of the *Yuen* action.

[8] Peter J. Henning, "Looking for Liability in BP's Gulf Oil Spill," *The New York Times* (June 7, 2010).

First, the plaintiff who files the initial action must publish a notice to the class within twenty days, informing class members of their right to file a motion for appointment as lead plaintiff. *See* 15 U.S.C. § 78u-4(a)(3)(A)(i). Here, in connection with the filing of the above-captioned action, notice was published on *Business Wire* on May 13, 2010. *See* Hoffman Aff., Ex. B.

Second, within sixty days of the publication of notice, any person who is a member of the proposed class may apply to be appointed as lead plaintiff, whether or not they have previously filed a complaint in the action. *See* 15 U.S.C. § 78u-4(a)(3)(A)(i)(II).

Third, the PSLRA provides that within ninety days after publication of notice, courts shall consider any motion made by a class member and appoint as lead plaintiff the member or members of the class that the court determines to be most capable of adequately representing the interests of class members. *See* 15 U.S.C. § 78u-4(a)(3)(B)(i). In determining the "most adequate plaintiff," the PSLRA provides that:

> [T]he court shall adopt a presumption that the most adequate plaintiff in any private action arising under this [Act] is the person or group of persons that –
>
> (aa)   has either filed the complaint or made a motion in response to a notice…;
>
> (bb)   in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
> (cc)   otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I); *Tarica*, 2000 U.S. Dist. LEXIS 5031, at *12-13.

The time period in which class members may move to be appointed lead plaintiff in this case expires on July 12, 2010. *See* 15 U.S.C. § 78u-4(a)(3)(A),(B). Pursuant to the PSLRA's provisions, and within the requisite time frame after publication of the required notice, Danica timely moves this Court to be appointed lead plaintiff on behalf of all members of the class. *See Tarica,* 2000 U.S.

6

Dist. LEXIS 5031, at *10. In addition, Danica has selected and retained counsel experienced in the prosecution of securities class actions to represent the class. *See* Hoffman Aff., Exs. D & E. Accordingly, Danica satisfies the PSLRA's filing requirements for seeking appointment as lead plaintiff.

### B. Danica is the "Most Adequate Plaintiff"

#### 1. Danica has the Largest Financial Interest in the Relief Sought by the Class

Danica suffered losses of approximately $4 million (on a FIFO basis) and $3.7 million (on a LIFO basis) in connection with its Class Period transactions in Transocean common stock.[9] *See* Hoffman Aff., Ex. C. To the best of its knowledge, Danica's loss represents the largest financial interest in the relief sought by the class. *See Tarica,* 2000 U.S. Dist. LEXIS 5031, at *12-13.

#### 2. Danica Satisfies Rule 23

In addition to possessing the largest financial interest in the relief sought by the class, the lead plaintiff must also "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc). Rule 23(a) provides that a party may serve as a class representative if the following four requirements are satisfied: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the

---

[9] FIFO and LIFO are the two methodologies that courts use to calculate losses. *See Thompson v. Shaw Group Inc.,* No. 04-1685, 2004 U.S. Dist. LEXIS 25641, at *14 (E.D. La. Dec. 13, 2004) ("Under FIFO, . . . shares sold during the class period are matched with the first shares held or purchased at the beginning of the class period, whichever comes first. Under the LIFO approach, a plaintiff's sales of the defendant's stock during the class period are matched against the last shares purchased, resulting in an off-set of class-period gains from a plaintiff's ultimate losses.").

preliminary showing of typicality and adequacy is required. *See Tarica,* 2000 U.S. Dist. LEXIS 5031, at *13; *In re Orthodontic Centers of Am., Inc., Sec. Litig.,* No. 01-949, 2001 U.S. Dist. LEXIS 21816, at *11 (E.D. La. Dec. 17, 2001).

### a. Danica is Typical

Under Rule 23(a)(3), the claims or defenses of the representative party must be typical of those of the class. The test of typicality is whether "plaintiffs' claims arise from the same series of events and are based on the same legal theories as the claims of all class members." *Thompson,* 2004 U.S. Dist. LEXIS 25641, at *17(citing *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 625 (5th Cir. 1999).

Here, Danica is typical because, just like all other class members asserting claims under the Exchange Act, it: (1) purchased or otherwise acquired Transocean securities during the Class Period; (2) at prices allegedly artificially inflated by defendants' materially false and misleading statements and/or omissions; and (3) suffered damages when corrective disclosures removed the inflation caused by the defendants' conduct causing the price of Transocean's securities to fall. *See Tarica,* 2000 U.S. Dist. LEXIS 5031, at *14. Thus, Danica's claims are typical of other class members' claims because both sets of claims arise out of the same course of events and predicated on identical theories of liability and damages. *See id.*

### b. Danica is Adequate

The adequacy requirement of Rule 23(a)(4) is met if the representative party makes a showing that it will "fairly and adequately protect the interests of the class." In evaluating adequacy, courts consider whether the: (1) "class representatives . . . [do] not have interests antagonistic to the class members;" and (2) lead plaintiff's selection of counsel is "qualified, experienced, and able to prosecute the action vigorously." *Tarica*, 2000 U.S. Dist. LEXIS 5031, at *14; *see also Orthodontic Centers of Am*, 2001 U.S. Dist. LEXIS 21816, at *12-13.

Here, Danica is adequate to represent the class. Danica's interests are aligned with the interests of the class as both suffered loss from the revelation of defendants' false and misleading statements and material omissions. Additionally, there is no evidence of antagonism between Danica and the class, and Danica has certified its willingness to serve as a representative of the class. *See* Hoffman Aff., Ex. A. Danica is a large, sophisticated institutional investor that suffered a substantial loss as a result of its Class Period purchases of Transocean stock and thus is committed to vigorously prosecuting this litigation and maximizing the recovery for the class. *See* Hoffman Aff., Exs. A & C. Finally, as shown below, Danica's proposed lead counsel is highly qualified, experienced and able to conduct this complex litigation in a professional manner. Thus, Danica satisfies the typicality and adequacy requirements of Federal Rule 23 for the purposes of this Motion.

### 3. Danica is the Prototypical Plaintiff Envisioned by the PSLRA

In addition to satisfying the preliminary requirements of Rule 23, the appointment of Danica as lead plaintiff also fulfills a critical legislative goal behind enacting the PSLRA – encouraging sophisticated institutions with large financial interests to serve as lead plaintiff in securities class actions. *See Gluck v. CellStar Corp.*, 976 F. Supp. 542, 548 (N.D. Tex. 1997) (noting that

"Congress has unequivocally expressed its preference for securities fraud litigation to be directed by large institutional investors"); *see also* H.R. Conf. Rep. No. 104-369 (1995) reprinted in 1995 U.S.C.C.A.N. 679, 733 ("The Conference Committee believes that increasing the role of institutional investors in class actions will ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions."). Danica is one of Denmark's largest pension funds with over 600,000 pensioners and over $40 billion in assets under management. Indeed, Danica's sophistication assures the class that it will adequately litigate this action and supervise class counsel. Thus, Danica is clearly a suitable – and indeed preferred – Lead Plaintiff.

### C.     The Court Should Approve Danica's Selection of Counsel

The PSLRA vests authority in the lead plaintiff to select and retain lead counsel, subject to the Court's approval. *See* 15 U.S.C. § 78u-4(a)(3)(B)(v); *Tarica*, 2000 U.S. Dist. LEXIS 5031, at *16. The Court should not disturb lead plaintiff's choice of counsel unless it is necessary to "protect the interests of the class." 15 U.S.C. §78u-4(a)(3)(B)(iii)(II)(aa); *Thompson*, 2004 U.S. Dist. LEXIS 25641, at *23. Because Danica has selected and retained counsel experienced in litigating securities fraud class actions with the resources to prosecute this action to the greatest recovery possible for the class, its choice of lead counsel should be approved.

Danica has selected Barroway Topaz as lead counsel for the class. Barroway Topaz specializes in prosecuting complex class action litigation and is one of the preeminent law firms in its field. Barroway Topaz is actively engaged in complex litigation and has successfully prosecuted numerous securities fraud class actions on behalf of injured investors. Barroway Topaz is currently serving as Lead or Co-Lead Counsel in several high profile securities class actions, including actions involving Lehman Brothers, Bank of America, Medtronic, and UBS and has secured billions of dollars in recoveries for investors. *See* Hoffman Aff., Ex. D.

In addition, Lowe Stein has ample experience prosecuting general civil and business matters, including securities and shareholder derivative suits in Louisiana and throughout the country. *See* Hoffman Aff., Ex E. Thus, the Court may be assured that in the event this motion is granted, the members of the class will receive the highest caliber of legal representation available from these firms. Both firms are highly qualified and will zealously represent the class's interests.

## IV.   CONCLUSION

For the foregoing reasons, Danica respectfully request that the Court: (i) appoint it as lead plaintiff pursuant to the PSLRA; (ii) approve its selection of Barroway Topaz to serve as lead counsel for the class; and (iii) approve its selection of Lowe Stein as liaison counsel for the class.

Dated: July 12, 2010

Respectfully submitted,

LOWE, STEIN, HOFFMAN,
ALLWEISS & HAUVER, L.L.P.

/s/ Mitchell J. Hoffman
Mitchell J. Hoffman (#6896)
Serena E. Pollack (#32682)
Jeffrey M. Hoffman (#29253)
701 Poydras Street, Suite 3600
New Orleans, Louisiana 70139-7735
Telephone: (504) 581-2450
Facsimile: (504) 581-2461

[Proposed] Liaison Counsel

BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP
Sean M. Handler
Darren J. Check
Naumon A. Amjed
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

-and-

BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP
Ramzi Abadou
580 California Street, Suite 1750
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

[Proposed] Lead Counsel